IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

MIDLAND-ODESSA DIVISION

FILED

FEB 27 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

Nathan Z. Hubert

Plaintiff,

v.

BP Supply Inc.

Defendant.

Civil Action No. 7:26cv 72

COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, including Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful employment practices complained of occurred in this District and the Defendant conducts business in this District.

3. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act. The EEOC issued a Notice of Right to Sue, which Plaintiff received on or about February 17, 2026. This action is filed within ninety (90)

days of Plaintiff's receipt of that Notice. A true and correct copy of the Notice is attached hereto as Exhibit A.

4. Plaintiff, Nathan Z. Hubert, is an individual residing in Texas who was employed by Defendant.

5. Defendant, BP Supply Inc., is a business entity that employed Plaintiff and conducted business in the State of Texas. Defendant maintains a business location at 1400 W. Broadway Street, Andrews, Texas 79714, where Plaintiff was employed. At all relevant times, Defendant employed fifteen (15) or more employees within the meaning of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.

6. Plaintiff was hired by Defendant on or about October 18, 2024. Plaintiff completed required safety training on October 21, 2024, and officially began working for Defendant on October 22, 2024.

7. Plaintiff was employed by Defendant as a delivery driver. In this role, Plaintiff's primary duties included delivering parts and merchandise to customers, making supplier pickups, maintaining delivery records, providing customer service, operating and maintaining a delivery vehicle, assisting with warehouse operations as needed, and complying with safety and organizational standards. Plaintiff was assigned to Defendant's Andrews, Texas location.

8. In or around February 2025, near the end of the workday (approximately 5:00 p.m.), Plaintiff was assigned a delivery to Plains, Texas (approximately 1.5–2 hours away). When en route back to the shop, Plaintiff was instructed to also retrieve a pump from a location approximately five minutes from the shop.

9. Plaintiff had previously observed that he was frequently assigned longer deliveries, particularly at or near the end of scheduled shifts, while other delivery drivers were not. On this occasion, at least two other drivers were present at the shop awaiting the end of their shifts.

10. Plaintiff approached the Coordinator, Alexis Lopez, and inquired why he was consistently assigned extended end-of-day deliveries and whether another driver could assist by retrieving the pump located near the shop.

11. In response, Ms. Lopez spoke to Plaintiff in a raised tone and stated that if Plaintiff did not like how assignments were handled, he could "leave," which Plaintiff reasonably understood to mean leave his employment with the company. Ms. Lopez then asked whether Plaintiff was refusing the delivery. Plaintiff stated that he was not refusing the assignment.

12. Ms. Lopez then stood up, approached Plaintiff in a confrontational manner, positioned herself close to his face, and began yelling and using profanity. Her voice was loud enough to be heard throughout the warehouse area.

13. After the exchange, Ms. Lopez stated she would report Plaintiff to management and contacted Assistant Manager, Jaime Salcido, after discovering that Branch Manager, Luis Rondan, had already left for the day. Plaintiff proceeded to complete the assigned delivery.

14. The following day, Plaintiff informed Mr. Rondan that he wished to make a formal complaint regarding Ms. Lopez's conduct. The Plaintiff's complaint was not documented at that time. Plaintiff was told the matter would be addressed.

15. On or about February 13, 2025, during a later follow-up meeting attended by Mr. Rondan and Mr. Salcido, Plaintiff was informed that there were no witnesses to the incident. Plaintiff identified Ruh, Eric, and Artemisa as individuals who were present and within hearing distance during the altercation.

16. Plaintiff subsequently completed a written incident report at management's direction.

17. Following this complaint, Plaintiff experienced increased workplace tension and was socially isolated by coworkers.

18. On April 11, 2025, during a meeting with Human Resources Manager, Mel Mosier, and Mr. Rondan, Plaintiff was informed that witnesses had allegedly stated Plaintiff was the aggressor. Plaintiff was further told that the facts were not in his favor and that his continued concern about the incident was contributing to workplace hostility.

19. On or about February 13, 2025, during the meeting referenced in Paragraph 15, Plaintiff informed Mr. Rondan and Mr. Salcido that Alexis Lopez had been using racial slurs in Plaintiff's presence and requested that such conduct cease. In response, Mr. Rondan accused Plaintiff of attempting to deflect from the prior altercation with Ms. Lopez.

20. On or about February 28, 2025, Plaintiff became aware that his disability, as defined by the Americans with Disabilities Act, was the subject of discussion among coworkers, including statements made by a coworker instructing others to exercise caution around Plaintiff. Plaintiff had not shared or authorized the disclosure of any medical information to coworkers.

21. On or about April 8, 2025, Plaintiff informed Mr. Rondan that he believed he was being harassed. Management declined to address Plaintiff's concerns during this discussion, which prompted Plaintiff to contact Human Resources. Plaintiff then reported the same concerns to Human Resources Manager Mel Mosier, both verbally and in a follow-up email, explaining that the conduct was affecting his morale and was of particular concern due to his disability status. Plaintiff was informed that an investigation would be conducted.

22. Shortly after Plaintiff raised his harassment concerns, Defendant informed Plaintiff that it could not substantiate his complaints and stated that coworkers were now aware of Plaintiff's disability status as a result of the investigation. Plaintiff was further told that Defendant could now accommodate him, despite Plaintiff not requesting an accommodation and despite the meeting arising solely from his harassment complaint. Plaintiff was issued a written disciplinary action for a prior incident that had already been resolved.

23. Following the written disciplinary action described above, Plaintiff's treatment at work worsened. Although Plaintiff had worked from October 2024 through April 2025 without major disciplinary issues, Plaintiff was subsequently issued two additional written disciplinary actions for unrelated incidents after raising harassment complaints.

24. One subsequent disciplinary action involved an allegation of reckless driving based on a customer complaint. Plaintiff reviewed video footage of the incident with management, which showed Plaintiff signaling and checking mirrors prior to changing lanes. Despite the footage and the absence of any prior serious driving violations, Plaintiff's explanation was rejected. Plaintiff was issued a four-day unpaid suspension and informed that the discipline constituted a final warning.

25. Beginning in or around May 2025 and continuing until his termination, Plaintiff was subjected to an informal demotion. Although his title and pay did not change, Plaintiff's job duties were significantly reduced. Plaintiff was repeatedly passed over for delivery assignments and instead assigned tasks that were not imposed on other drivers in the same manner or frequency. During this period, delivery assignments and scheduling were communicated primarily through electronic messaging systems in which Plaintiff was not consistently included, resulting in Plaintiff being skipped for driving assignments while other drivers were sent out.

26. On or about June 30, 2025, a coworker questioned Plaintiff about why he was not driving and stated that Plaintiff was likely not driving because of statements being made about him. The

coworker repeated statements reflecting ongoing rumors about Plaintiff's disability as defined by the Americans with Disabilities Act.

27. On or about July 17, 2025, during a workplace presentation by a supplemental insurance provider, a representative asked employees whether they had a serious medical condition that would disqualify them from coverage. Following the presentation, Plaintiff was questioned by coworkers about why he did not purchase a policy.

28. On or about August 4, 2025, Plaintiff made an additional complaint to Human Resources regarding negative statements being made towards him. The following day, Plaintiff was told by management that he had misinterpreted what was said.

29. On or about August 15, 2025, Plaintiff informed his supervisor that a previously documented injury continued to affect him. Plaintiff disclosed this information in good faith to promote workplace safety and avoid a potential incident, not to request an accommodation. Although the injury was not covered, Plaintiff accepted management's representation that he would be placed on light duty.

30. Despite management's representation that Plaintiff would be placed on light duty, Plaintiff's workload increased. Plaintiff was assigned physically demanding tasks and deliveries that exceeded established employee lift limits and that, under Defendant's policy, required assistance from another employee. These assignments were made despite Defendant's knowledge of Plaintiff's physical limitations and the stated light-duty arrangement.

31. After completing one such delivery, Plaintiff was instructed to return to make a correction. During the return trip, Plaintiff experienced a near-miss traffic incident involving another driver. Plaintiff immediately reported the incident to management and later completed an accident report. On or about August 26, 2025, Plaintiff was summoned to a meeting with management and Human Resources and was terminated. Plaintiff was informed that the termination was based on alleged repeated safety violations and that management believed Plaintiff had misrepresented the facts of the near-miss incident.

32. In each instance involving alleged unsafe driving conduct, Plaintiff was immediately deemed at fault and subjected to discipline.

33. By contrast, similarly situated driver Artemisa Del Bosque Garcia, who was involved in an at-fault accident resulting in a traffic citation and a separate near miss incident, was not subjected to comparable unpaid suspension or termination.

34. Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

35. Plaintiff is a member of a protected class under Title VII based on race.

36. Plaintiff was subjected to unwelcome conduct based on race, including racial slurs in his presence and racially hostile statements in the workplace.

37. Plaintiff engaged in protected activity when he complained to management and Human Resources about racial harassment.

38. After Plaintiff engaged in protected activity, Defendant subjected Plaintiff to adverse employment actions, including increased discipline, disparate treatment, reduction in job duties, and termination, because of his race and in retaliation for his complaints of racial harassment.

39. The close timing between Plaintiff's complaints of racial harassment and the escalation of discipline, reduction of duties, and eventual termination supports a causal connection between Plaintiff's protected activity and the adverse employment actions.

40. The conduct described above was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and create a hostile work environment.

41. Defendant's actions were intentional and in violation of Plaintiff's rights under Title VII.

42. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered economic loss, including lost wages and benefits, and continues to suffer economic damages as a result of Defendant's unlawful conduct.

43. Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

44. Plaintiff has a disability and was regarded as having a disability within the meaning of the ADA.

45. Plaintiff was qualified to perform the essential functions of his position, with or without reasonable accommodation.

46. Plaintiff disclosed medical information in good faith and did not authorize Defendant to disclose his medical condition to coworkers.

47. Defendant failed to maintain the confidentiality of Plaintiff's medical information and permitted Plaintiff's medical condition to become a subject of workplace discussion.

48. Plaintiff engaged in protected activity by reporting disability-related harassment and raising concerns regarding workplace treatment connected to his medical condition.

49. After Plaintiff engaged in protected activity, Defendant subjected Plaintiff to adverse employment actions, including inconsistent discipline, failure to honor light-duty restrictions, increased workload, and termination, because of and in retaliation for Plaintiff's protected complaints and disclosures concerning his disability.

50. The close timing between Plaintiff's protected disclosures and complaints and Defendant's adverse actions supports a causal connection between Plaintiff's protected activity and his termination.

51. Defendant's actions constitute discrimination and retaliation in violation of the ADA.

52. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered economic loss, emotional distress, and other damages.

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Enter judgment in favor of Plaintiff and against Defendant;

b. Award back pay, front pay, and lost benefits;

c. Award compensatory damages for emotional distress;

d. Award punitive damages as permitted by law;

e. Award costs and reasonable attorney's fees pursuant to statute;

f. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

February 27, 2026

Nathan Z. Hubert

Andrews, TX 79714

(432) 340-3948

nathanzhubert@icloud.com

Plaintiff, Pro Se